# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES | |
| v. | No. 3:15-cr-188 (SRU) |
| MARK LEIGH-JAMES | |

## ORDER

On September 16, 2016, I sentenced the defendant, Mark Leigh-James ("Leigh-James"), to 120 months' imprisonment after Leigh-James pled guilty pursuant to a plea agreement to two counts of a nine-count indictment. *See* Indictment, Doc. No. 9; Min. Entry, Doc. No. 65; Plea Agreement, Doc. No. 50; Judgment, Doc. No. 67 (entered October 12, 2016). Specifically, Leigh-James pled guilty to one count of possession with intent to distribute and distribution of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B),[1] and to one count of carrying a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i). *See* Judgment, Doc. No. 67. (I imposed 60 months' imprisonment on each count, to run consecutively. That sentence represented the mandatory minimum term.) I sentenced Leigh-James when he was 24 years old, and he is now 28. Leigh-James is currently housed at the work camp at FMC Devens (the "Camp"). His estimated release date is April 11, 2024. *See* FEDERAL BUREAU OF PRISONS, *Find an Inmate*, https://www.bop.gov/inmateloc/ (last visited July 15, 2020). Thus, Leigh-James has served about half of his sentence.

On April 20, 2020, Leigh-James made a *pro se* motion to reduce his sentence based on "extraordinary and compelling reasons" pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). *See* Mot. for

---

[1] Although the indictment charged a violation of 21 U.S.C. § 841(b)(1)(A) rather than (b)(1)(B), Leigh-James pled guilty to the lesser-included offense. *See* PSR, Doc. No. 56, at ¶ 1; Plea Agreement, Doc. No. 50, at 1.

Release, Doc. No. 80.  In particular, Leigh-James cites the danger of COVID-19 and asks that I "transfer[] him to serve the remainder of his sentence with special conditions to Home Confinement."  *Id.* at 2.  On May 27, 2020, Leigh-James supplemented his motion with an update regarding the situation at FMC Devens.  *See* Leigh-James's *pro se* Supp. Mem., Doc. No. 84.  On June 18, Leigh-James's lawyer filed a further supplemental memorandum in support of Leigh-James's motion for compassionate release, which included Leigh-James's medical records.  *See* Leigh-James's Supp. Mot., Doc. No. 87; Medical Records, Doc. No. 89.  On June 25, 2020, the government filed an opposition.  *See* Gov't Opp'n, Doc. No. 91.  On July 1, Leigh-James's lawyer filed another supplemental memorandum.  *See* Leigh-James's 2d Supp. Mem., Doc. No. 92.

For the following reasons, I **deny** Leigh-James's motion.

## I.     Standard of Review

The First Step Act of 2018 (the "FSA") amended the language of section 3582(c)(1)(A).  Before the FSA, only the Director of the Bureau of Prisons (the "BOP") could make a motion for the court to reduce a defendant's sentence based on extraordinary and compelling reasons.  It is widely acknowledged that the BOP fell short in its gatekeeper role and that, as a result, too few inmates were granted compassionate release.  *See, e.g.*, U.S. Dep't of Justice, Office of the Inspector General, Evaluation and Inspections Division, *The Federal Bureau of Prisons' Compassionate Release Program* i (April 2013), https://oig.justice.gov/reports/2013/e1306.pdf ("[W]e found that the existing BOP compassionate release program has been poorly managed and implemented inconsistently, likely resulting in eligible inmates not being considered for release and in terminally ill inmates dying before their requests were decided."); Shon Hopwood, *Second Looks & Second Chances*, 41 CARDOZO L. REV. 83, 105–06 (2019); William W. Berry

III, *Extraordinary and Compelling: A Re-Examination of the Justifications for Compassionate Release*, 68 MD. L. REV. 850, 868 (2009) (noting that, in the 1990s, 0.01 percent of inmates annually were granted compassionate release).

Congress passed the FSA against that backdrop. The FSA altered section 3582(c)(1)(A), in part, to increase the use of compassionate release. *See* 164 Cong. Rec. H10358 (daily ed. Dec. 20, 2018) (titling changes to section 3582(c)(1)(A) as "Increasing the Use and Transparency of Compassionate Release"). In particular, the FSA amended section 3582(c)(1)(A) to allow a defendant him- or herself to bring a motion for compassionate release. Section 3582(c) now reads, in relevant part:

> (c) Modification of an imposed term of imprisonment. The court may not modify a term of imprisonment once it has been imposed except that – (1) in any case –
>
> > (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that –
> >
> > > (i)  extraordinary and compelling reasons warrant such a reduction; . . .
> >
> > and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

The applicable "policy statement[] issued by the Sentencing Commission" is contained in U.S.S.G. § 1B1.13, which reads, in relevant part:

> Upon motion of the Director of the Bureau of Prisons under 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment . . . if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent they are applicable, the court determines that—

3

(1)
- (A) Extraordinary and compelling reasons warrant the reduction; or

- (B) The defendant (i) is at least 70 years old; and (ii) has served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c) for the offense or offenses for which the defendant is imprisoned;

(2) The defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and

(3) the reduction is consistent with this policy statement.

U.S.S.G. § 1B1.13.

Two application notes to section 1B1.13 further elucidate the meaning of "extraordinary and compelling reasons." Application note three provides, simply, that rehabilitation of a defendant "is not, by itself, an extraordinary and compelling reason for purposes of this policy statement." U.S.S.G. § 1B1.13 cmt. n.3 (citing 28 U.S.C. § 994(t)). Application note one sets forth three specific examples of "extraordinary and compelling reasons" and also one catch-all provision. The first example explains that an inmate's medical condition rises to the level of an extraordinary and compelling reason when:

> (i) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
> (ii) The defendant is –
>
> > (I) suffering from a serious physical or mental condition,
> > (II) suffering from a serious functional or cognitive impairment, or
> > (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

U.S.S.G. § 1B1.13 cmt. n.1(A). The other two specific examples in application note one regard defendants over the age of 65 (U.S.S.G. § 1B1.13 cmt. n.1(B)) and situations in which an inmate may be needed to care for his children or his spouse/partner (U.S.S.G. § 1B1.13 cmt. n.1(C)). *See id.* The catch-all provision, titled "Other Reasons," provides that extraordinary and compelling reasons also exist when, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 cmt. n.1(D).

The Sentencing Commission has not amended section 1B1.13 since Congress passed the FSA. Indeed, it could not because a quorum of the Sentencing Commission does not presently exist. As a result, some anachronisms within section 1B1.13 seem in tension with the FSA. In particular, courts note that two clauses in section 1B1.13—including the catch-all provision at U.S.S.G. § 1B1.13 cmt. n.1(D)—still require that the Director of the BOP be the one to bring a motion for relief under section 3582(c)(1)(A). Of course, though, the FSA altered section 3582(c)(1)(A) directly and eliminated that requirement by allowing a defendant him- or herself to bring such a motion under certain circumstances.

As I have noted elsewhere, nearly all district courts hold that—since the FSA's passage—section 1B1.13 is not binding but is, rather, helpful guidance. *See United States v. Almontes*, 2020 WL 1812713, at *3 (D. Conn. Apr. 9, 2020) (collecting cases); *United States v. Locke*, 2020 WL 3101016, at *4 (W.D. Wash. June 11, 2020) (collecting more cases). I agree with the vast majority of district courts: I can consider whether reasons other than the inmate's medical condition, age, and family circumstances amount to an extraordinary and compelling reason to reduce that inmate's sentence.

5

In granting motions for reductions in sentence under section 3582(c)(1)(A) that are based on the threat posed by COVID-19, courts within this circuit and across the country have concluded that "extraordinary and compelling" reasons for release exist when an incarcerated defendant suffers from health conditions or other infirmities that make him particularly susceptible to serious complications should he contract COVID-19. *See, e.g.*, *United States v. Colvin*, 2020 WL 1613943, at *4 (D. Conn. Apr. 2, 2020) (diabetes); *United States v. Peters*, 2020 WL 2092617, at *4 (D. Conn. May 1, 2020) (immunocompromised); *United States v. Campagna*, 2020 WL 1489829, at *1 (S.D.N.Y. Mar. 27, 2020) (immunocompromised and age); *United States v. Smith*, 2020 WL 1849748, at *4 (S.D.N.Y. Apr. 13, 2020) (age and asthma). The defendant bears the burden of proving that he or she is entitled to a sentence reduction. *See United States v. Morales*, 2020 WL 2097630, at *2 (D. Conn. May 1, 2020).

## II.     Background

### A.  Factual Background

The government began investigating Leigh-James because it received information that Leigh-James was a "high volume narcotics trafficker" of methamphetamine and oxycodone. *See* PSR, Doc. No. 56, at ¶ 6. Between July 16 and September 18, 2015, Connecticut and federal law enforcement officers directed at least six controlled buys from Leigh-James. *See id.* at ¶¶ 8–13. On October 5, 2015, Leigh-James was arrested. *See id.* at ¶ 14. Before he was apprehended, Leigh-James fled on foot and dropped a backpack, which contained 7.5 grams of heroin. *See id.* at ¶¶ 14–15. Law enforcement agents "followed [Leigh-James] into a parking structure . . . where they had to call for backup in order to get him into custody." *Id.* at ¶ 14. During a search of Leigh-James's car, law enforcement agents (with the aid of a drug-sniffing dog) found another backpack containing:  (1) approximately 120 grams of methamphetamine and (2) a fully loaded

Kel-Tec .380 semi-automatic handgun. *Id.* at ¶ 15. Law enforcement agents also found, in a jacket inside Leigh-James's car, a fully loaded Charter Arms .44 magnum revolver. *Id.* at ¶ 15. That particular firearm had been "reported stolen from a third party in Stratford, Connecticut in or around 2009." *Id.*

Although before his involvement in this case Leigh-James had no previous adult criminal convictions, he had been arrested in 2013 for conduct similar to his conduct in this case. (At the time of his arrest in this case, Leigh-James was out on state bond ($100,000) in that case. *See* PSR, Doc. No. 56, at ¶ 6.)[2] In that 2013 case, Leigh-James was charged with (1) possession of narcotics, (2) possession with intent to sell, (3) illegal possession of a weapon in a motor vehicle, and (4) carrying a pistol without a permit. *See id.* at ¶ 36. When searching Leigh-James incident to arrest in that case, officers found a "Glock 23 .40 caliber handgun . . . inside Mr. Leigh-James['s] pants' waistband. The gun was loaded with a full 13 round magazine." *Id.* A search of Leigh-James's car turned up almost two dozen oxycodone pills and 1.7 grams of crack cocaine. *Id.*

At the time of sentencing, Leigh-James faced a mandatory minimum of 120 months' imprisonment (60 months on each count that I had to impose consecutively). *See* PSR, Doc. No. 56, at ¶¶ 53–54. His guidelines range was 147 to 168 months' imprisonment. *See id.* at ¶ 54.

### III.  Discussion

#### A.  Parties' Arguments

In his *pro se* motion for compassionate release, Leigh-James asks that I release him to home confinement for the remainder of his sentence because the threat of COVID-19 is an

---

[2] The PSR also indicates that at the time of his arrest in this case, Leigh-James was "wanted by the State of Virginia for lying in connection with an attempt to obtain a firearm in that state." PSR, Doc. No. 56, at ¶ 6.

"extraordinary and compelling" reason warranting his release. *See* Mot. for Release, Doc. No. 80, at 2, 5. Leigh-James notes that because he "lives in a dormitory like environment" at the Camp, it is difficult for him to protect himself against COVID-19, such as by practicing social distancing. *See id.* at 1. Further, Leigh-James points out that because he is "a 28 year old African American man," his race is also "an inherent risk factor which makes . . . him vulnerable to contracting" COVID-19. *Id.* at 1–2. However, Leigh-James acknowledges that "[h]e does not need any medical care at this time." *Id.* at 11. Additionally, Leigh-James conceded that, as of April 14, 2020, there were no COVID-19 cases at the Camp. *Id.* at 8. Still, Leigh-James argues that "if Mr. Leigh-James was to contract the virus he will die." *Id.*

Leigh-James also argues that the Section 3553(a) factors weigh in favor of a sentence reduction. Leigh-James notes that he has "an unblemished disciplinary record" and "a PATTERN risk score of minimum," which indicates that he has a very low risk of recidivism. *Id.* at 2. Indeed, Leigh-James explains that he "works at the Power House" and also "as the visiting room orderly." *Id.* at 10. Previously, Leigh-James was a GED tutor. *See id.* Leigh-James reports that he "takes pride in what he does and . . . never complains." *Id.* Leigh-James would "like to return to real estate development and help make his community stronger by rehabilitating dilapidated buildings and empowering younger African American male(s) like himself, to pursue a crime free life." *Id.* at 10–11. Leigh-James would like to start a family with his current girlfriend and to be able to take care of his parents and grandparents. *Id.* at 11. Should he be released, Leigh-James indicates that he will live with his grandparents. *See id.*

In his supplemental *pro se* motion, drafted on May 19, 2020, Leigh-James reports that the situation at FMC Devens has worsened. Indeed, Leigh-James reports that at least 18 inmates had been infected and that FMC Devens was not responding well to the outbreak. *See* Leigh-James's

*pro se* Supp. Mem., Doc. No. 84, at 2.³  Leigh-James engages in a detailed recounting of all the ways in which the opportunities for social distancing and personal hygiene are lacking at the Camp.  *See id.* at 3–5.  Leigh-James also cites several cases in which courts have granted compassionate release to prisoners housed at FMC Devens.  *See id.* at 2–3.  (None of those cases is analogous to this case because, as explained below, Leigh-James has not alleged that he has any significant risk factor that makes him especially vulnerable to contracting COVID-19.)⁴

The supplemental memorandum submitted by Leigh-James's counsel advances for the first time the argument that Leigh-James has "health issues" that place him in danger.  Mem. in Supp. of Leigh-James's Supp. Mot., Doc. No. 87-1, at 1.  Specifically, Leigh-James's counsel points to Leigh-James's "previous hypertension diagnosis" and the fact that Leigh-James "was diagnosed with slight anemia after his arrival at Wyatt in 2015, and anemia does cause immunosuppression on some level."  *See id.* at 1–2; 5 ("Mr. Leigh-James is vulnerable to complications from COVID-19 due to the hypertension that his medical records make note of, as well as his previous anemia diagnosis.").  Leigh-James's counsel also argues that because Leigh-James is a "former smoker," he is at an elevated risk should he contract COVID-19.  *See id.* at 7; Leigh-James's 2d Supp. Mem., Doc. No. 92, at 2.  In addition, Leigh-James's counsel notes that a lab report from June 30, 2017 indicates that Leigh-James registered a lower-than-average white blood cell count.  *See* Leigh-James's 2d Supp. Mem., Doc. No. 92, at 2; Medical Records, Doc. No. 89, at 1–2.

---

³ Leigh-James very briefly mentions that the conduct of FMC Devens staff is "deliberately indifferent" to the Attorney General's instruction regarding release of prisoners.  *See* Leigh-James's *pro se* Supp. Mem., Doc. No. 84, at 5–6.  To the extent that Leigh-James wishes to assert a claim for a constitutional violation, he should file a new case to that effect.  My consideration in this case is limited to Leigh-James's motion for compassionate release.
⁴ *See United States v. Pena*, 2020 WL 2798259, at *1 (D. Mass. May 29, 2020) (Pena is 70 years old); *United States v. DiMenna*, No. 3:17-cr-202 (VAB) (D. Conn. May 11, 2020), doc. no. 71, at 1–2 (DiMenna is 77 years old and has high blood pressure); *United States v. Hoover*, No. 5:16-cr-58-1 (D. Vt. May 18, 2020), doc. no. 85, at 4 (Hoover is obese and has diabetes and high blood pressure; he also had served over 85 percent of his sentence); *United States v. Bischoff*, 2020 WL 2561423, at *3 (D.N.H. May 19, 2020) (Bischoff is 79 years old and has hypertension).

Leigh-James's counsel also make arguments that go beyond Leigh-James's medical condition.  For instance, Leigh-James's counsel reiterates that Leigh-James's race is another factor putting Leigh-James at elevated risk.  *See* Mem. in Supp. of Leigh-James's Supp. Mot., Doc. No. 87-1, at 7.  The supplemental memorandum also points out that the situation at FMC Devens has worsened:  As of June 18, Leigh-James's counsel reported that 31 inmates and 23 staff members had tested positive and that two inmates died.  *See id.* at 2.  Leigh-James's counsel also makes general arguments regarding why COVID-19 is likely to continue to spread widely in prisons.  *See id.* at 5–7.  Finally, Leigh-James's counsel emphasizes that the Section 3553(a) factors weigh significantly in Leigh-James's favor.  *See id.* at 7–9.

The government opposes Leigh-James's motion because, in its view, Leigh-James has not demonstrated that "extraordinary and compelling reasons" warrant a reduction in sentence.  *See* Gov't Opp'n, Doc. No. 91, at 2.  The government argues that, even if Leigh-James did suffer from hypertension and slight anemia, those conditions do not "rise to the level required for compassionate release."  *Id.* at 8.  However, the government does not accept that Leigh-James suffers from either condition.  Regarding hypertension, the government points out that, in Leigh-James's extensive medical records, there is a single mention of hypertension, and that mention is not a diagnosis.  *See id.*  Nor is there any record that Leigh-James was tested for hypertension or that he is being treated for it.  *See id.* at 8–9.  The government notes that "[t]he same is true for the 'slight anemia' noted in the PSR."  *Id.* at 9 (referencing PSR, Doc. No. 56, at ¶ 46).  The government argues that Leigh-James's stated health risks simply do not rise to the level of "extraordinary and compelling circumstances" that other courts have recognized.  *See id.* at 9–10.  In general, the government argues that Leigh-James "provides no reason why the COVID-19

10

threat poses particular risks to him personally any more than the general prison population." *Id.* at 12.

The government also recounts the precautionary steps that the BOP has taken at facilities housing federal inmates in response to COVID-19. *See id.* at 12–13. The government further notes that, as of June 25, 2020, "there have been no positive cases of COVID-19 at the camp at FMC Devens at any time." *Id.* at 13–14. And, at the main facility at FMC Devens, as of June 25, the government reports that there were 23 active cases of COVID-19. *See id.* at 13.

Finally, the government explains that the Section 3553(a) factors counsel against a sentence reduction largely because Leigh-James's "underlying offenses were extremely serious and dangerous." *Id.* at 14. The government also points out that, in its view, Leigh-James's personal history and characteristics also do not weigh in his favor because he had a stable home life, he had been working as a real estate agent for the 18 months leading up to his arrest, and he had been attending college. *See id.* at 16. "In essence, the defendant committed the instant offenses against a backdrop of a stable, productive and promising life." *Id.*[5] The government concludes: "The time that the defendant has served is not sufficient to satisfy the purposes of sentencing in this case. He has served less than half of his 120 month sentence, a sentence that reflected the minimum he could have received given the charges." *Id.* at 17.

B. <u>Exhaustion</u>

Normally, a defendant may not bring a motion for compassionate release pursuant to Section 3582(c)(1)(A) until "the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18

---

[5] I noted as much when I sentenced Leigh-James. *See* Tr. of Sentencing Hr'g, Doc. No. 66, at 17:14–18:1.

11

U.S.C. § 3582(c)(1)(A). Courts are divided on whether that requirement is jurisdictional or merely a mandatory claims-processing rule. *See Smith*, 2020 WL 1849748, at *2–3. I agree with courts that hold that the requirement is non-jurisdictional and is, rather, a mandatory claims-processing rule. *See, e.g.*, *id.*; *United States v. Gentille*, 2020 WL 1814158, at *3 (S.D.N.Y. Apr. 9, 2020); *United States v. Alam*, 960 F.3d 831, 832–33 (6th Cir. 2020). As a mandatory claims-processing rule, the exhaustion requirement is subject to waiver. *See Coleman v. Newburgh Enlarged City School Dist.*, 503 F.3d 198, 203 (2d Cir. 2007).

In this case, the parties agree that Leigh-James requested relief from the BOP on April 10, 2020 and that, on May 4, 2020, the Warden of FMC Devens declined to bring a motion on Leigh-James's behalf. *See* Mem. in Supp. of Leigh-James's Supp. Mot., Doc. No. 87-1, at 2 (noting that Leigh-James's request "was denied on May 4, 2020"); Gov't Opp'n, Doc. No. 91, at 5 (noting the same and conceding that "the defendant appears to have satisfied the exhaustion requirement under Section 3582(c)(1)(A)"); Medical Records, Doc. No. 89, at 55 (noting, on May 4, 2020, that "Inmate LEIGH-JAMES was informed that his [Reduction in Sentence Request] has been denied"). However, nothing in the record (or in the parties' briefing) indicates that Leigh-James has "fully exhausted all administrative rights to appeal" that denial. Similarly, 30 days did not lapse between Leigh-James's request and the Warden's denial of that request. Still, the government concedes that "the defendant appears to have satisfied the exhaustion requirement under Section 3582(c)(1)(A)." Gov't Opp'n, Doc. No. 91, at 5. Thus, the government has waived any potential objection based on Leigh-James's failure to exhaust.

C. No Extraordinary and Compelling Reasons Warrant Leigh-James's Release.

"The simple risk of the coronavirus pandemic in an institutional environment is not an extraordinary or compelling reason warranting release." *United States v. Adams*, 2020 WL

3026458, at *3 (D. Conn. June 4, 2020); *see also United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) ("[T]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release."). Although there have been COVID-19 cases at FMC Devens and are currently active cases there,[6] the government represents that there have been none at the Camp, which is where Leigh-James is housed. The possibility that inmates at the Camp will eventually test positive for COVID-19 does not alone rise to the level of an extraordinary or compelling reason warranting Leigh-James's release. Similarly, Leigh-James's generalized arguments regarding COVID-19 and its outsized effect in prisons—although accurate[7]—do not constitute an extraordinary or compelling reason warranting Leigh-James's release because those arguments are not particular to him. *Cf. United States v. Haney*, 2020 WL 1821988, at *5 (S.D.N.Y. Apr. 13, 2020) (denying 61-year-old defendant's argument that he was entitled to compassionate release because of his age because "if Haney's age alone were a sufficient factor to grant compassionate release in these circumstances, it follows that every federal inmate in the country above the age of 60 should be forthwith released from detention, a result that does not remotely comply with the limited scope of compassionate release . . . ").

Nor do any of the alleged risk factors that Leigh-James cites rise, alone or together, to the level of an extraordinary and compelling reason warranting a reduction in his sentence. First, I agree with the government that Leigh-James appears to have no medical conditions that would make him especially vulnerable to COVID-19, should he contract it. Leigh-James is 28 and

---

[6] As of July 15, 2020, according to the BOP, there were 7 active cases among inmates at FMC Devens. *See* FEDERAL BUREAU OF PRISONS, *COVID-19 Cases*, https://www.bop.gov/coronavirus/ (last visited July 15, 2020).

[7] *See, e.g.*, *United States v. Colvin*, 2020 WL 1613943, at *4 (D. Conn. Apr. 2, 2020) (noting that inmates generally are "unable to practice effective social distancing and hygiene to minimize" their risks of exposure); Timothy Williams, Libby Seline, and Rebecca Griesbach, *Coronavirus Cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES, June 16, 2020, https://www.nytimes.com/2020/06/16/us/coronavirus-inmates-prisons-jails.html.

generally healthy.  *See, e.g.*, Mot. for Release, Doc. No. 80, at 11 (Leigh-James himself noting that he "does not need any medical care at this time"); Medical Records, Doc. No. 89, at 92, 94 (referring to Leigh-James, on July 25, 2018, as a "26yo inmate, healthy, takes no medications"); PSR, Doc. No. 56, at ¶ 46 ("Mr. Leigh-James reported that he is in good health.").

Further, although Leigh-James's lawyer references a "previous hypertension diagnosis,"[8] it does not appear that Leigh-James has, in fact, been diagnosed with hypertension.  Leigh-James's medical records refer to hypertension only once, and that was not a diagnosis.  Rather, Leigh-James apparently went to an optional nutritional education class with a dietician, who discussed hypertension.  *See* Medical Records, Doc. No. 89, at 7 ("Inmate attended Hypertension and Sodium nutrition class on 4/15/19.  Discussed diagnosis parameters for Hypertension diagnosis and risk factors.").  Notably, too, Leigh-James himself makes no mention of his alleged hypertension.  Finally, as I have explained elsewhere, the CDC identifies pulmonary— not primary—hypertension as a "serious heart condition" that elevates the risk of serious illness from COVID-19.  *See United States v. Hull*, 2020 WL 2475639, at *2 (D. Conn. May 13, 2020); *see also* CTRS. FOR DISEASE CONTROL AND PREVENTION, *People of Any Age with Underlying Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited July 15, 2020)).  Neither Leigh-James's medical records nor his briefing touches on the nature of his alleged hypertension.  Similarly, the only mention of Leigh-James's "slight anemia" is in the PSR; his medical records do not indicate that Leigh-James has anemia.  *See* PSR, Doc. No. 56, at ¶ 46.  Further, the CDC does not list anemia as a factor that increases the risk for serious illness from COVID-19.  *See* CTRS. FOR DISEASE CONTROL AND PREVENTION, *People of Any Age with Underlying Medical*

---

[8] *See* Mem. in Supp. of Leigh-James's Supp. Mot., Doc. No. 87-1, at 1.

*Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited July 15, 2020). To the extent Leigh-James suggests that his history as a smoker puts him at special risk, there is nothing in the record to suggest that his history of smoking (if he has one) has impacted his health. The same goes for Leigh-James's low white-blood-cell count on June 30, 2017.

Finally, Leigh-James's argument that he is at a higher risk of serious illness because of his race does not amount to an extraordinary and compelling reason warranting his release. Leigh-James is, sadly, correct that the rates of death and hospitalization from COVID-19 among Black Americans is much higher than that among the general population. *See, e.g.*, Tiffany Ford, Sarah Reber, and Richard V. Reeves, *Race Gaps in COVID-19 Deaths Are Even Bigger Than They Appear*, BROOKINGS, June 16, 2020, https://www.brookings.edu/blog/up-front/2020/06/16/race-gaps-in-covid-19-deaths-are-even-bigger-than-they-appear/. However, so far as is currently understood, that difference most probably owes to "[l]ong-standing systemic health and social inequities." CTRS. FOR DISEASE CONTROL AND PREVENTION, *COVID-19 in Racial and Ethnic Minority Grps.*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/racial-ethnic-minorities.html (last visited July 15, 2020). Thus, as other courts have also recognized, the fact of Leigh-James's race itself does not constitute a risk factor for COVID-19, in the same way, as, for instance, an underlying medical condition does. *See, e.g.*, *United States v. Alexander*, 2020 WL 2507778, at *4 (D.N.J. May 15, 2020); *Carlos M.D. v. Anderson*, 2020 WL 2487646, at *8 (D.N.J. May 14, 2020); *United States v. White*, 2020 WL 2733891, at *5 (E.D. Mich. May 26, 2020); *United States v. Fuller*, 2020 WL 2557337, at *4 n.4 (W.D. Wash. May 20, 2020).

In sum, because Leigh-James has not shown that extraordinary and compelling reasons warrant his release, I **deny** his motion for compassionate release pursuant to Section 3582(c)(1)(A). Even if I had found that Leigh-James had shown that extraordinary and compelling reasons warrant his release, I would still deny his motion because he poses a danger to the community.

D. Leigh-James Poses a Danger to the Community.

Pursuant to U.S.S.G. § 1B1.13, before granting a motion for compassionate release, I should also consider whether the "defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2). Leigh-James does pose a danger to the community because he has demonstrated that he would deal drugs and carry loaded guns, even when facing potential punishment for the same conduct. When Leigh-James was arrested in this case, he was "armed with two fully loaded firearms." *See* Gov't Opp'n, Doc. No. 91, at 14; PSR, Doc. No. 56, at ¶ 15. Leigh-James was also dealing harmful drugs—in this case, methamphetamine. Further, although Leigh-James had no history of criminal convictions, at the time of his arrest in this case, he was out on state bond in a case charging him with crimes based on similar conduct. When Leigh-James was arrested in that case, officers recovered a loaded firearm from his waistband. *See* PSR, Doc. No. 56, at ¶ 36.

The government argues—and I agree—that Leigh-James's proposed reentry plan does not ensure that Leigh-James will not be a danger to the community. Leigh-James proposes to return to live with his grandmother in Stratford. *See* Mot. for Release, Doc. No. 80, at 11. But Leigh-James was living with his grandmother at the same address at time of his offense conduct in this case. *See* PSR, Doc. No. 56, at ¶¶ 39, 41. Leigh-James similarly indicates that he has a job lined up to work at a real estate firm. *See* Mem. in Supp. of Leigh-James's Supp. Mot., Doc.

16

No. 87-1, at 8.  But Leigh-James was working as a real estate broker at the time of his offense conduct in this case.  *See* PSR, Doc. No. 56, at ¶ 50.

    E.   18 U.S.C. § 3553(a) Factors.

Because Leigh-James has demonstrated neither that "exceptional and compelling reasons" warrant a reduction in his sentence nor that he does not pose a danger to the community (both of which are necessary conditions to granting Leigh-James's motion), I need not address the 3553(a) sentencing factors.

**IV.**   **Conclusion**

For the foregoing reasons, I **deny** Leigh-James's motion (and supplemental motion) for a reduction in sentence, doc. nos. 80 and 87.

IT IS SO ORDERED.

Dated at Bridgeport, Connecticut, this 15th day of July 2020.

                                                          /s/ STEFAN R. UNDERHILL
                                                          Stefan R. Underhill
                                                          United States District Judge